UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION -- PIKEVILLE

| | |
|---|---|
| FRANKIE NEWSOME, KIMBERLY HOWELL, and STACEY VARNEY, | CIVIL NO. 7:17-CV-57-KKC |
| Plaintiffs, | |
| V. | OPINION & ORDER |
| BAYER CORPORATION, et al., | |
| Defendants. | |

This matter is before the Court on a Motion to Remand to Pike County Circuit Court filed by plaintiffs (DE 10).  For the following reasons, plaintiffs' motion to remand (DE 10) is **GRANTED**.

## I.      BACKGROUND

The plaintiffs originally filed this civil suit in Pike Circuit Court on February 24, 2017 (DE 1-1, Complaint).   In their Complaint, Plaintiffs named five defendants:   Bayer Corporation, Bayer Healthcare LLC, Bayer Essure, Inc., (f/k/a Conceptus, Inc.), and Bayer Healthcare Pharmaceuticals, Inc. (collectively herein called the "Bayer defendants"), and Pikeville Medical Center, Inc. ("PMC").  Defendants timely removed the action to this Court on grounds of both federal question and diversity jurisdiction. (DE 1, at 2-3).  Plaintiffs claim this Court has no jurisdiction and have asked that the matter be remanded back to state court.  (DE 10).

This case involves the plaintiffs' use of a permanent birth control device called "Essure." Plaintiffs each underwent surgery at PMC to have the Essure device implanted, Newsome and Varney in 2012, and Howell in 2013.  All plaintiffs allege that they suffered damages because PMC failed to properly inform them of the risks associated with the device, and failed

to use reasonable care in implanting the device. (DE 1-1). In November of 2013, plaintiff Howell learned that she was pregnant and vaginally delivered her son on June 30, 2014. (DE 1-1, at 73-74).

The plaintiffs contend that the device was originally created by Conceptus, Inc., a company purchased by Bayer in 2013. (DE 1-1, at 9-12). In 2002, Essure was granted pre-market approval as a Class III medical device by the Food and Drug Administration, pursuant to the Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act. *See* (DE 1-1 at 19-20). The plaintiffs do not attack the pre-market approval process. Instead, the plaintiffs' complaint alleges the Bayer defendants failed to conform to FDA requirements regarding post-market monitoring of the device. As a specific example of this conduct, plaintiffs allege that Conceptus failed to report to the FDA adverse effects that were discovered once Essure became widely used in the market, despite having an affirmative duty to do so (DE 1-1, at 40-52). Plaintiffs allege that these actions constitute a violation of various state tort laws and that, but for the violations, the plaintiffs would never have used the device (DE 1-1).

## II.    ANALYSIS

Although several motions are pending in this matter, the Court must first determine whether removal from Pike County Circuit Court was proper. On a motion to remand, the burden rests with the defendant to prove that this Court has original jurisdiction. *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 549 (6th Cir. 2006). Original jurisdiction exists through either diversity of citizenship, *see* 28 U.S.C. §§ 1332(a) and 1441(b), or federal question jurisdiction, *see* 28 U.S.C. §§ 1331 and 1441(a). When doubts as to the propriety of removal exist, "the removal statute should be strictly construed and all doubts resolved in favor of remand." *Eastman*, 438 F.3d at 550. The Court considers the parties' arguments on jurisdiction below.

## A. Federal Question Jurisdiction

Courts have consistently applied the "well-pleaded complaint" rule when reviewing federal question jurisdiction on a motion to remand. "To determine whether the claim arises under federal law, we examine the 'well pleaded' allegations of the complaint and ignore potential defenses…." *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 560 (2007) (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003)). As a result of the rule, "federal questions presented by defenses—or even by the plaintiff's anticipatory rebuttal of an expected defense—cannot support jurisdiction." *Dillon v. Medtronic, Inc.*, 992 F.Supp.2d 751, 755 (2014) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 10 (1983)). "So, with only rare exception, a dispute over whether federal law trumps the plaintiff's state cause of action does not satisfy § 1331, since preemption is usually raised as a defense." Id. (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987). "'[R]emoval and preemption are two distinct concepts,' and the fact that plaintiffs' claim might ultimately prove to be preempted does not establish that it is removable to federal court." *Strong v. Telectronics Pacing Systems, Inc*., 78 F.3d 256, 261 (6th Cir. 1996) (quoting *Warner v. Ford Motor Co.*, 46 F.3d 531 (6th Cir. 1995).

In their Complaint, Plaintiffs assert various state-law tort claims against the defendants. *See* (DE 1-1, Pl. Complaint); *see also* (DE 10-3, Pl. Mem. in Support of Mtn. to Remand, at 1). As such, the claims within the well-pleaded complaint do not directly arise under federal law or jurisdiction. However, the United States Court of Appeals for the Sixth Circuit recognizes three exceptions to the well-pleaded complaint rule, by which defendants can still show that federal jurisdiction is proper. *See Mikulski*, 501 F.3d at 560. The first two exceptions, artful-pleading and complete preemption, are inapplicable in this case. The artful pleading doctrine requires there first to be a federal cause of action that the plaintiff is trying to artfully plead

around, which Congress has not provided under the FDCA. *See Mikulski,* 501 F.3d at 560; 21 U.S.C. § 337(a). Further, the Sixth Circuit has specifically declined to extend the doctrine of complete preemption to the Medical Device Amendments of the FDCA. *See Strong,* 78 F.3d at 259. Thus, only the third exception, the substantial federal question doctrine, is at issue.

### 1) The substantial federal question doctrine

Plaintiffs' Complaint does not directly raise a federal question. The United States Supreme Court has held, however, that federal courts have federal question jurisdiction over state law claims that raise a substantial federal issue, but only when the exercise of such jurisdiction will not upset the balance of state and federal judicial responsibilities. *See Grable & Sons Metal Products, Inc., v. Darue Engineering & Manufacturing,* 545 U.S. 308, 125 S.Ct. 2363 (2005).

The Sixth Circuit, relying on *Grable,* has developed a three-part test to determine whether state law claims implicate federal question jurisdiction:

> (1) The state-law claim must necessarily raise a disputed federal issue; (2) the federal interest in the issue must be substantial; and (3) the exercise of jurisdiction must not disturb any congressionally approved balance of federal and state judicial responsibilities.

*Mikulski,* 501 F.3d at 568.

### a. Whether the state law claim raises a disputed federal issue

In Plaintiffs' Complaint, the claims for relief arise exclusively under state law. The Supreme Court has specifically stated that the MDA only preempts state requirements that are "different from, or in addition to" requirements imposed by federal law, leaving room for independent state causes of action. *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 330 (2008). "Thus, § 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." *Id.* In this case, it is unclear that litigation regarding the defendants'

4

state duties—duties that merely parallel federal law—will necessarily raise a disputed federal issue. But even if the Court were to assume a disputed federal issue, the claims fail the remaining two elements of the test as discussed below.

### b. Whether the federal issues are substantial

The Sixth Circuit has set forth four factors for determining whether state law claims implicate substantial federal issues. They are:

> 1) Whether the case includes a federal agency, and particularly, whether that agency's compliance with the federal statute is in dispute; (2) whether the federal question is important (i.e., not trivial); (3) whether a decision on the federal question will resolve the case (i.e. the federal question is not merely incidental to the outcome); and (4) whether a decision as to the federal question will control numerous other cases.

*Mikulski*, 501 F.3d at 570.

The claims in this case do not implicate a federal agency or call upon this Court to review an agency's compliance with the federal statute in dispute. *Mikulski*, 501 F.3d at 568-570. Here, it is the conduct of private companies, the Bayer defendants, which allegedly violated state tort laws.

Second, the federal questions that may be raised in this litigation do not appear to be important to the federal judicial system as a whole, as required by the Supreme Court in *Gunn*. *See Gunn v. Minton*, 568 U.S. 251, 263 (2013). Here, the defendants state that the "federal issues are hotly contested," but cite the conduct of the parties and the sufficiency of plaintiffs' allegations as contested, rather than any meaningful interpretation of the MDA or federal law. *See e.g.,* (DE 13 at 19-20) (pointing the Court to plaintiffs' failure to rely on statements made by the defendants, and plaintiffs' failure to show that defects in manufacturing and training caused their injuries). Defendants offer little or no evidence that applying the federal requirements in issue, particularly reporting requirements, to the parties' conduct will implicate broader or more substantial federal issues, or control numerous other cases going forward. *See Mikulski,* 501 F.3d at 570-571. Further, it appears

that at least some of the reporting obligations may be fairly unique to these defendants. In a premarket approval letter, some of the reporting obligations were described as "[i]n addition to the post approval requirements," and "agreed to" by the Bayer defendants and an agency of the FDA. (DE 1-2, Premarket Approval Letter). Regardless, it is unclear that applying routine provisions of the MDA to defendants' conduct, without more, places this case in the "special and small category of cases" that raise issues important to the federal system as a whole. *Gunn,* 568 U.S. at 258-260.

While federal preemption will be raised in this case, that alone does not raise a substantial issue of federal law. "[State] courts are capable of deciding whether the plaintiffs' claims against [the defendant] are preempted," and it is not a basis for conferring federal jurisdiction. *In Re Darvocet, Darvon and Propoxyphene Products Liability Litigation,* 889 F.Supp.2d 931, 938 (E.D. Ky 2012); *see also Strong,* 78 F.3d at 261 (quoting *Warner v. Ford Motor Co.,* 46 F.3d 531 (6th Cir. 1995).

Finally, since plaintiffs have brought various state-law tort claims, each with various elements and none of which are compliance with the MDA, it is unclear that the federal issues in this case will be dispositive. Ultimately, it appears that any violation of federal law will only be used as evidence to prove a broader violation of Kentucky state law. That federal issues may be raised among state law claims is not enough to confer jurisdiction, since state courts are presumptively competent to apply federal law. *See Mikulski,* 501 F.3d at 560.

### c. Whether the exercise of jurisdiction will disturb any congressionally approved balance of federal and state judicial responsibility

In considering the balance of state and federal judicial responsibilities, this Court should consider whether Congress created a private right of action under the Statute in dispute, and whether Congress would have meant to welcome the particular state law tort case into

federal court. *See Grable,* 545 U.S. at 318-319 (citing *Merrell Dow Pharmaceuticals Inc., v. Thompson,* 478 U.S. 804, 106 S.Ct. 3229 (1986)). In this case, Congress has neither provided a private right of action, "nor completely precluded state jurisdiction over claims alleging violations of the MDA." *Schilmiller,* 44 F.Supp.3d at 731. Further, the Supreme Court has made it clear that states have the power to provide damage actions premised on violations of the FDCA, and that such actions merely parallel federal law. *Riegel,* 552 U.S. at 330. Given such, this Court once again joins the many district courts finding that the types of claims raised here do not pass the *Grable* test, and do not confer federal question jurisdiction. *See Johnson v. Bayer Corp.,* No. 4:16-CV-729 (CEJ), 2016 WL 3015187 (E.D. Mo. 2016); *Dorman v. Bayer Corp.,* No. 4:16-CV-601 (HEA), 2016 WL 7033765 (E.D. Mo. 2016); *Dillon v. Medtronic, Inc.,* 992 F.Supp.2d 751 (E.D. Ky. 2014); *Schilmiller v. Medtronic, Inc.,* 44 F.Supp.3d 721 (W.D. Ky. 2014); *McCann v. West Chester Hospital, LLC,* 233 F.Supp.3d 607 (S.D. Ohio 2017); *Lee v. Kirkpatrick,* No. 1:16-CV-123 (GNS), 2016 WL 7197478 (W.D. Ky. 2016).

## B. Diversity Jurisdiction

Defendants allege that this Court has diversity jurisdiction over the claims of each plaintiff, and that PMC has been fraudulently joined. (DE 13 at 5-13). Specifically, defendants allege that all claims against PMC are foreclosed by Kentucky's statute of limitations, and that PMC's joinder is an attempt to improperly destroy diversity jurisdiction. Additionally, the defendants argue that the claims of each plaintiff have been fraudulently misjoined to those of the other plaintiffs. (DE 13 at 13-17). As an alternative form of relief in the event the Court does not exercise federal question jurisdiction over the entire case, Defendants ask the Court to sever each plaintiff, and retain diversity jurisdiction over the plaintiffs that have no colorable claim against PMC. *Id.*

While some circuits have allowed defendants to establish fraudulent joinder by raising the affirmative defense of an expired statute of limitations, the Sixth Circuit has yet to rule on the issue. *See Williams v. Altman,* 2013 U.S. Dist. LEXIS 281 (E.D. Ky. 2013). However, since the defendants have not carried their burden of establishing the affirmative defense, this Court need not resolve the issue of whether it is even proper to consider an affirmative defense when reviewing a motion to remand based upon fraudulent joinder. *See e.g., Williams,* 2013 U.S. Dist. LEXIS 281, at *13 n.2.

### 1) Fraudulent Joinder

Fraudulent joinder of a local party "will not defeat removal on diversity grounds." *Saginaw Housing Com'n v. Bannum, Inc.,* 576 F.3d 620, 624 (6th Cir. 2009) (quoting *Coyne v. Am. Tobacco Co.,* 183 F.3d 488, 493 (6th Cir. 1999)). Joinder of a party is fraudulent "when the non-removing party joins a party against whom there is no colorable cause of action." *Id.* The burden of proof rests with the removing party, and requires showing that the non-removing party could not have established a cause of action under state law against the non-diverse party that was joined. *Coyne,* 183 F.3d at 493. In reviewing such a claim, this Court must resolve "all disputed questions of fact and ambiguities in the controlling state law in favor of the non-removing party [and] [a]ll doubts as to the propriety of removal are resolved in favor of remand." *Id.* (quoting *Alexander v. Electronic Data Sys. Corp.,* 13 F.3d 940, 949 (6th Cir. 1994)). A district court is generally limited to piercing the pleadings in search of *undisputed* facts that negate the underlying claim and, even within this context of limited piercing, must draw any contested issues of fact in the plaintiff's favor. *See Casias v. Wal-mart Stores, Inc.,* 695 F.3d at 428, 433 (6th Cir. 2012); *see also Walker v. Philip Morris USA, Inc.,* 443 Fed. Appx. 946, 954-956 (6th Cir. 2011).

While the Court is confined to the above mentioned review of defendants' fraudulent joinder claim, the statute of limitations is an affirmative defense that the defendants must prove. *See* Ky. R. Civ. P. 8.03; *Lynn Mining Co. v. Kelly,* 394 S.W.2d 755, 759 (Ky. 1965). Kentucky has a one-year statute of limitations for medical malpractice claims. Ky. Rev. Stat. Ann. § 413.140(1)(e), (2). The claim begins to accrue at the time the injury is first discovered, or when it should have been discovered in the exercise of reasonable care. *Id.* To discover an injury, a plaintiff must know two things: (1) that she has been wronged; and (2) the identity of the person who wronged her. *Wiseman v. Alliant Hosps., Inc.,* 37 S.W.3d 709, 712 (Ky. 2000). The Sixth Circuit has guided our analysis on the knowledge necessary to trigger the Kentucky statute of limitations:

> In constructing knowledge, [] a court must give special consideration to the patient's perspective because '[o]ne who possesses no medical knowledge should not be held responsible for discovering an injury based on the wrongful act of a physician'…In Kentucky, when there is a disputed issue of fact as to when a plaintiff 'discovered or should have discovered' his cause of action, that factual issue should be resolved by the jury in cases in which the plaintiff has asked for a jury….Federal law does not present a conflict with Kentucky law.

*Elam v. Menzies,* 594 F.3d 463, 466-467 (6th Cir. 2010) (quoting *Wiseman,* 37 S.W.3d at 712-713). Since the plaintiffs filed this case on February 24, 2017, the defendants must prove that, prior to February 24, 2016, the plaintiffs knew, or should have known, that they were injured by PMC.

In *Williams v. Altman,* 2013 U.S. Dist. LEXIS 281 (E.D. Ky. 2013), this Court ruled on arguments very similar to the ones brought by the defendants in this case. In *Williams*, the Court reiterated that inferences arising from factual disputes about when a plaintiff knew or should have known of an injury under the Kentucky statute of limitations must be drawn in favor of the plaintiff at this stage. *See id.* at *15-17. In reviewing the defendants' arguments that the plaintiff should have known of her medical injury years before she filed her

complaint, this Court held that, "[defendants] may ultimately be correct, but that is not for this Court to say at this juncture." *Id.* Instead, the Court reasoned:

> [W]hen [plaintiff's] pain and suffering began is not dispositive. What matters is when she should have realized that she had been wronged. Under Kentucky law that is a question of fact for the jury. And the defendants offer no evidence that would prevent a reasonable jury from accepting [plaintiff's] claim that she had no reason to suspect medical malpractice until her appointment on October 4, 2011…The defendants point to the fact that she experienced pelvic pain before her October 2011 appointment, and that the FDA issued Public Health Notifications. But those facts do not definitively establish that [plaintiff] should have known she was the victim of malpractice. She has no medical expertise. So a jury could find it reasonable for [plaintiff] not to realize that the symptoms she experienced were the result of medical malpractice…Judging this evidence and drawing factual inferences based on the weighing of that evidence is for a jury, not a judge.

*Id.* at 15-17 (citations omitted). Similarly in this case, the defendants have only pointed to inferences arising from facts that are disputed by the plaintiffs. As such, the defendants have not carried their burden of proving that the Kentucky statute of limitations prevents the plaintiffs from having a colorable basis of recovery under Kentucky law.

### a. Stacey Varney

Here, the defendants cite to several pieces of evidence purportedly showing that plaintiff Varney should have known about her claims against PMC prior to February 24, 2016. At this procedural stage, the Court disagrees.

Defendants cite Varney's complaint, in which she admits that she bled profusely following surgery, and that it took six months for her to "stop bleeding huge clots of blood." (DE 1-1, at 76). The alleged pain and bleeding caused her to contact and visit her physician on February 16, 2012, on April 12, 2012, on October 10, 2012, and on January 21, 2014. Defendants argue that these visits are evidence that plaintiff Varney knew or should have known of her injury for purposes of the Kentucky Statute of Limitations.

But the defendants have failed to rebut plaintiff Varney's statement that at no time prior to February 24, 2016 was she told, or was it even suggested, that Essure or the implanting

procedure were the causes of her problems. (DE 10-4 at 5). Medical records on February 16, 2012, show that Varney was prescribed prometrium to control bleeding, but no action was taken or suggested as to her Essure device. (DE 10-4, at 37). Medical records on April 12, 2012, show that she was prescribed a different medicine and a hysterosalpingogram ("HSG") was scheduled to check the placement of the Essure device. (DE 10-4 at 40-42). The HSG demonstrated no evidence of spillage of contrast into the pelvic cavity from either fallopian tube, and other than a potentially trapped air bubble, the physician's impression only noted a "[s]uccessful tubal occlusion." (DE 10-4 at 44). Nothing in those records contradicts Varney's claim that she was led to believe that she was experiencing normal post-procedure bleeding at that time. (DE 10-4 at 5). Medical records from a CT scan of Varney's abdomen area and pelvis on October 10, 2012, showed "[n]o evidence of acute intra-abdominal or pelvic abnormality." (DE 10-4 at 46). Finally, Varney underwent a transvaginal ultrasound and an endometrial biopsy on January 21, 2014. It is not apparent that either of these procedures linked Varney's complaints to the Essure device or implantation procedure. *See* (DE 10-4 at 48-50). Given this evidence, the defendants have not proven that Varney knew or should have known of her injury prior to February 24, 2016. *See e.g., Elam,* 594 F.3d at 466 ("[A] court must give special consideration to the patient's perspective because one who possesses no medical knowledge should not be held responsible for discovering an injury based on the wrongful act of a physician") (internal quotations omitted).

A question of fact exists as to when Varney knew or should have known of PMC's alleged role in her injury—their alleged malpractice in both recommending and placing the device— before February 24, 2016. At best, the defense asks this Court to infer such knowledge from other facts within the record, facts that are disputed by Varney. While the defendants may ultimately be correct as to knowledge, such disputes are best resolved by juries, not a court

reviewing fraudulent joinder. *See Williams,* 2013 U.S. Dist. LEXIS 281, 15-17; *see also Elam,* 594 F.3d at 466-467.

### b. Kimberly Howell

Defendants make similar arguments based on the medical records of Kimberly Howell— essentially that she knew or should have known that she had been wronged prior to February 24, 2016. Once again, and on the current record before the Court, this notion is disputed.

Defendants point out that Howell learned that she was pregnant on November 11, 2013, and thus must have known of PMC's role in her injury by that time. (DE 13 at 9-10). But while this may establish that Howell knew there had been some type of failure with the device, it does not establish that she knew it to be PMC's placement of the device that harmed her, or their knowledge that the device had been defective at the time of distribution or sale. *See Wiseman,* 37 S.W.3d at 712 ("To discover an injury, a plaintiff must know two things: (1) that she has been wronged; and (2) the identity of the person who wronged her"). As did Varney, plaintiff Howell vigorously denies having been told or otherwise knowing, prior to February 24, 2016, that it was misplacement of the device by PMC, or another PMC failure, that led to her injuries. (DE 16, at 5-6). And in fact, Howell claims that, "Dr. Hobbs confirmed that no method of birth control was 100% effective," meaning her pregnancy was not inextricably linked with either device failure or mistakes by PMC. (DE 10-6 at 3).

Further, Howell points out that an HSG performed by PMC on July 16, 2013, described "satisfactory placement of Essure contraceptive devices with no spillage of contrast." (DE 10-6 at 49). On December 12, 2014, Howell presented to PMC for an annual exam and complained of various pain. Despite the Essure device having failed to prevent pregnancy, there is no indication in the medical records that her pain was linked to the device at this time. Howell was found positive for dysmenorrhea and prescribed oral birth control during that visit. (DE 10-6 at 3, 53-59). While the defendants are correct to point out that

Howell eventually underwent a bilateral salpingectomy to remove the Essure device in July of 2015, Howell argues that the procedure was to provide her permanent sterilization through a traditional tubal ligation, rather than in response to her complaints of pain. (DE 16 at 6). Howell points out that as late as October 2016, a transvaginal ultrasound was interpreted as normal, with fluid in the cul-de-sac, and no coils were mentioned in the medical records. (DE 16 at 7). Later that month, Howell argues the search for her source of pain continued and she was tested for interstitial cystitis which was negative. *Id.* She maintains that no doctor ever definitively related the Essure device to her problems, and it was not until she heard a radio advertisement in late summer of 2016 that she first linked Essure to her symptoms. (DE 10-6 at 6).

Like Varney, a question of fact exists as to when Howell knew or should have known that she had been wronged. The defendants have not proven that the Kentucky statute of limitations prevents Howell from making out a colorable claim against PMC. Specifically, the defendants have pointed to no facts preventing a reasonable jury from concluding that Howell did not and should not have known of PMC's role in her injury—their alleged malpractice in both recommending and placing the device—before February 24, 2016. At best, the defense asks this Court to infer such knowledge from other facts within the record, facts that are disputed by Howell. While the defendants may ultimately be correct as to knowledge, such disputes are best resolved by juries, not a court reviewing fraudulent joinder. *See Williams,* 2013 U.S. Dist. LEXIS 281, 15-17; *see also Elam,* 594 F.3d at 466-467.

### c. Frankie Newsome

Finally, defendants argue that plaintiff Newsome knew or should have known of PMC's role in her injury over one year prior to filing suit, and her claims are thus barred by the Kentucky Statute of Limitations. Once again, the record presents a dispute as to when this knowledge began.

Defendants first point out that Newsome has alleged heavy bleeding immediately after implantation of the device on May 2, 2012, and was admitted to the emergency room a few days later. (DE 13 at 12). Newsome admits that at least one physician said that it was uncommon to bleed with the Essure procedure, but points out that Dr. Hobbs, her implanting physician, assured Newsome that her bleeding was normal post-procedure bleeding and not associated with Essure. (DE 16 at 9). Defendants further argue that Newsome underwent surgery to remove the Essure device on April 22, 2013, and Newsome must have known of PMC's alleged failures at that time. (DE 13 at 12). Medical records prior to the surgery list Newsome as having the Essure procedure done, but the "[r]ight side didn't [sic] take." (DE 10-8 at 55). But in response, Newsome argues that the pathology report following surgery only mentions the removal of one Essure coil, and that she was not told that the second coil had not been removed. (DE 16 at 10). On Newsome's version of the story, her bleeding never slowed down, but she had no reason to suspect Essure as the cause, since she believed the entire device had been removed with no effect on her symptoms. *Id.* Further, Newsome argues that her physicians either failed to suspect the retained coil as a cause, or at minimum failed to relay the information. Rather than removal of the second coil, Newsome's physicians suggested that she undergo endometrial ablation, after having been diagnosed with dysfunctional uterine bleeding and the detection of a simple cyst. (DE 10-8 at 5). According to Newsome, it was not until a visit to a new gynecologist on October 11, 2016, that it was ever suggested to her that both Essure coils may not have been removed and that a retained coil may be causing her symptoms. (DE 10-8 at 6-7). And even at that point, the retained coil was one suggestion in a list of potential sources. *Id.*

Like Varney and Howell, a question of fact exists as to when Newsome knew or should have known that she had been wronged. The defense asks this Court to infer Newsome's knowledge from other facts within the record, facts that are disputed by Newsome. While

the defendants may ultimately be correct as to knowledge, such disputes are best resolved by juries, not a court reviewing fraudulent joinder. *See Williams,* 2013 U.S. Dist. LEXIS 281, 15-17; *see also Elam,* 594 F.3d at 466-467.

### 2) Fraudulent Misjoinder

Finally, the defendants argue that each of the plaintiffs' claims have been fraudulently misjoined to each other. (DE 13 at 6, n. 1) To the extent the Court does not exercise federal question jurisdiction over the entire case, the defendants ask the Court to sever any plaintiffs who have claims against PMC that are barred by the Kentucky Statute of Limitations and retain diversity jurisdiction over their claims against the remaining defendants. *Id.* That argument, however, is now moot because the Court has found that each plaintiff has a colorable claim against the defendants.

## III. CONCLUSION

The defendants have not carried their burden of showing that this Court has original jurisdiction. Original jurisdiction exists through either diversity of citizenship, *see* 28 U.S.C. §§ 1332(a) and 1441(b), or federal question jurisdiction, *see* 28 U.S.C. §§ 1331 and 1441(a). Finding neither, this Court must remand.

Accordingly, it is hereby **ORDERED** as follows:

(1) This matter is **REMANDED** to the docket of the Pike County Circuit Court;

(2) All remaining motions are **DENIED AS MOOT**; and

(3) This case is **STRICKEN** from the Court's active docket.

Dated April 23, 2018.



KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY